Good morning, Your Honor. Eric Brunstad on behalf of Appellant American Home. In this case, Your Honors, the payment agreements specify the deductible reimbursement obligation that UMG disputes. The payment agreements have an arbitration clause within them. UMG's dispute over its deductible reimbursement obligation clearly falls within the scope of the arbitration clause in the payment agreements. Therefore, because it clearly falls within the scope of the arbitration clause, it has to be subject to arbitration. Yeah, but this started out as a lawsuit over policy coverage and went on for a year as a lawsuit over policy coverage. We end up with a summary judgment in which a defense shows up in which reimbursement is to some degree managed. Just before you make your motion to stay, you all of a sudden try to put into the ongoing arbitration some reimbursement claim. You try and get them to accept money, so all of a sudden there's something to reimburse. They don't accept the check. The district judge says, you know, this is just basically a policy dispute. This is not a payment dispute under the payment agreement. This is a dispute under the policy. What's your response? And that was incorrect, Judge Fletcher, for the following reasons. I know you think it's incorrect, so why? For the following reasons. Your Honor is correct. Judge Fletcher, you're correct that this was initially a dispute alleging bad faith and failure to defend. Of course, American Home's response, one of them is that, well, no, it was a failure for the duty to cooperate. So there's a dispute over the policy question. But also, American Home asserted as a defense that UMG cannot claim damages. Why? Because the $360,000 that UMG is claiming and the 2.4 million attorney's fees are all things which UMG is financially responsible for under the deductible reimbursement provision in the payment agreements. Now, the payment agreements deal with the payment issues, including the deductible reimbursement obligation. The policies deal with the insurance issues, such as duty to defend, those kinds of things. Here we are talking about a dispute over the payment issues, which fall within the scope of the payment agreements. Now, American Home was not aware of a dispute within the meaning of the payment agreements until, in response to American Home's motion for summary judgment, UMG said, oh, no, we do not have a deductible reimbursement obligation. That was the first time it articulated the dispute. Without a dispute, the payment agreements are very clear on this. Without a dispute, the arbitration clause is not triggered. Let me understand from you what you think the dispute is as to payment obligation. It seems to me fairly simple. Until they receive payment, there's no obligation to reimburse. And their argument is we receive no payment, therefore there's no obligation. And you say that's got to be arbitrated? It does. Because that – I mean, 2 plus 2 is 4. I mean, the arbitrator says, why are you coming to me with this question? There's no payment. There's no reimbursement. And you held up your lawsuit for that? American Home has been trying to pay the amounts. It has sent a series of checks over and over again to UMG. UMG has failed to negotiate. When did it start paying those checks? Give me a sort of a narrative of when the checks were sent, what were the amounts, and so on. Well, initially this dispute arose in April 13th of 2007 when – I'm sorry. It arises out of other litigation, the national litigation that was commenced in April of 2005. Then we have the dispute I explained before, which is that UMG contends American Home failed to honor its duty to defend. American Home contends they failed to cooperate. So we have a dispute. There was a settlement agreement in which UMG agreed to pay $360,000 to the plaintiffs in the national litigation. This is in the national litigation. Correct. I'm not asking about that. I'm asking about checks that your client sends to UMG and UMG never cashes because you were relying on those. That's correct. What happened was is that after the suit was commenced – well, the parties were still discussing this. It was pre-litigation.  And then American Home evaluated it and prepared the checks. I'll get you on the exact dates. The checks. There's not just one series of checks that were submitted. There were several. We gave them the checks. They didn't negotiate them. We gave them the checks again. They didn't negotiate them. Now, there's also another point in the payment agreements. American Home was not obligated to send the checks to UMG. Why? Because where there is a dispute, contractually, under the payment agreements, American Home was entitled to withhold the checks. And notwithstanding that, because it has a contractual right of set-off. It has a contractual right of set-off. That doesn't vitiate the fact that there was a dispute under the payment agreements. It can't. The fact that American Home can withhold the checks because it has a right of set-off, and therefore there's no dispute, I think that's incorrect, Judge Fletcher. Here, what happened is they first articulated their dispute. The arbitration clause itself requires them to particularize their dispute. We don't have a payment obligation to you at all. That's their defense. When that happens, when they articulate their dispute, then it has to go to an arbitrate. Immediately, it has to be filed with the arbitrators. It has to go to arbitration. So the fact that they didn't negotiate the checks, or the fact that even the checks necessarily might not even have been paid to them, which they were offered to them, at least, doesn't really change the analysis. There was a dispute over whether they had a reimbursement obligation. And that dispute is the heart of the defense. You can't make a claim for damages because the amounts that you would seek from us, you'd have to then turn around and pay us. That is all something that's for arbitration. Now, again, the second point is that any issue of the arbitrability of this is itself for the arbitrators to decide, because the payment agreements itself specify that not only shall there be arbitration, but any question of arbitrability is also for the arbitrators to decide. It's very clearly stated in the payment agreements.  Now, where they agreed not only that the payment dispute would go to arbitration, but that the arbitrators would decide the arbitrability of it, there really is no role for the courts here at all. The language is clear and unmistakable. Arbitrability was basically agreed to be in the hands of the arbitrators. So all of the points that Your Honor, I think, is making is also for the arbitrators to decide. So just give me a picture. If you went to the arbitrator, what would you arbitrate? Whether, in fact, they have a payment dispute. Now, Judge Kaczynski, what they say is we don't have a deductible reimbursement obligation. Vivendi does. Our corporate parent does. Now, of course, that's wrong, because the payment agreements themselves contractually say there's joint and several liability for the deductible reimbursement obligation among Vivendi and all the named insured. They concede they're a named insured. In the deposition of Mr. Carnegie in the proceedings below, he said, well, yes, if there's a deductible reimbursement obligation, we would be responsible for ultimately having to pay it. So what the arbitrators would have to decide is if their argument about, oh, they don't really have a deductible reimbursement obligation, Vivendi does, is true. That's obviously wrong. But that is the basis for their contesting the deductible reimbursement obligation. Now, what Judge Fies did in this case is Judge Fies said, look, I think this is primarily an issue about the policies. He didn't say it was exclusively an issue about the policies, primarily an issue about the policies, and so I think this really should proceed in litigation. That's not right. Under Dean Witter, we know if there are arbitrable issues and non-arbitrable issues, the arbitrable issues go to the arbitrators. And here the arbitrable issue is, is there a deductible reimbursement obligation? If so, then if the arbitrators decide that, when we're done having that issue decided, we can then go back to the court and say, well, the arbitrators have now decided that they do have a deductible reimbursement obligation. And since they, and then the court can then continue with the litigation. Now, all the discovery and all the things that happened up until the summary judgment point in this case were all about the non-arbitrable issues. Those weren't about the arbitral issues. Is there a deductible reimbursement obligation? So under this court's precedence, even though Judge Fies did not find there was waiver, there really can't be. First of all, UMG has a remarkably heavy burden to demonstrate waiver, and under this court's precedence, such as the Fisher case and the Van Ness case, they don't qualify for a finding of waiver here. Again, the key point is that they did not first clearly articulate their dispute about the deductible reimbursement obligation until their response to the motion for summary judgment. In your brief, you characterized the payment agreement as the master. Correct, Judge Fletcher. How do you get that? Okay. I understand it's a binding agreement. Yes. But master agreement suggests that it somehow has priority over the policies. In this sense, it does, Judge Fletcher. The payment agreement is the master agreement. Appended to the master agreement, the payment agreements, are the schedules. The schedules list the policies, and appended to them are the LRPS, the large risk rating plan endorsements. So the payment agreement is the master agreement to which all the other agreements are appended. And the payment agreement says in very clear terms, the obligations of the insurer, your American home, are to provide insurance to you as provided in the attached schedules and policies, and your obligation to us include paying us. I don't understand what the word master is then doing, because it sounds as though you just argued to me that any dispute about the policy is now arbitrable. But, of course, you said that's not true. American Home Below conceded that the issue about the duty to defend, the duty to cooperate, which really arise under the policies, is not subject to arbitration. The parties agree as to that. What we argue is that any dispute over the payment terms, the deductible reimbursement obligation, is clearly subject to the payment agreements, because it's specified in the payment agreements. The payment agreements are the documents, the 2001-2004 payment agreements, are the documents that set forth that obligation. And the arbitration clause says any dispute arising out of this agreement, which would include the payment terms, is subject to arbitration. And, again, arbitrability itself. You know, a few moments ago, if I remember correctly, you quoted the district judge as having said that the dispute in front of him largely concerned the policies, and therefore it should stay there and no stay. Is that what you said? A paraphrase. He didn't say that. What he said is that the payment agreements largely concern the mode and manner. He had said nothing about the policy agreement in front of him, the dispute in front of him, largely concerning that. What he said was the dispute in front of me is basically about coverage, and the policy agreements are about something else. So I just don't go along with the argument that followed from your paraphrase. I think that what he was saying was that the dispute involves primarily the issues under the policies. He did not say that. He did not use the word primarily in describing the dispute in front of him. And I apologize, then, for having misread his opinion. But regardless, his conclusion was that this issue, the deductible reimbursement obligation, is not subject to arbitration, when in fact it clearly is. The payment agreements set forth the deductible reimbursement obligation, which is the heart of American Homes' defense. The payment agreements provide that any dispute under any of those provisions of the payment agreements are subject to arbitration. Arbitrability, as well, is for the arbitrators to decide. So there's really no role for the courts here at all. Could you explain what role New York courts are supposed to play in determining arbitrability under the payment agreements? There is a potential choice of law between California law and New York law in interpreting the payment agreements. And Judge Fee said California law applies. Our position is that New York law and California law on this point are the same. And the particular point of law was whether the documents that sort of are part of a same package are to be construed as a whole. And our argument is that they are under both California law and New York law. But isn't there some role for New York courts to play in determining arbitrability? Not under the Federal Arbitration Act and not under the Supreme Court's precedents, not under the first options. Under the payment agreements, however. No, Your Honor. The payment agreements do not allow for the New York courts or any courts in New York to intervene in the balance of my time. Thank you, Your Honor. Good morning. May it please the Court, Kirk Passage for UMG and Universal Music. The last statement counsel made is simply flat wrong.  It must be decided by a court in New York, State or Federal. It's in one of the addenda to the agreement. And so that provision was added. Can I put my nose in there? Certainly. Where is that? I want to read it. Be happy to. It is in ER 582. And it says. Hang on, hang on, hang on. Okay. I'm at ER 582. Paragraph number five. The last sentence of paragraph number five says, similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the city, county, and state of New York. That's the agreement. Apparently, American Home elected to waive that clause, too, because it did not seek to stay this proceeding by commencing a proceeding in New York. In fact, it didn't even ask the court below to stay the proceeding to permit the panel or a New York court to decide arbitrability. It keeps going to have its cake and eat it, too. First, it asked the trial court to go ahead and rule on the summary judgment motion. And only if it lost the summary judgment motion, then to consider a stay. And when it asked for a stay, it didn't ask to stay to resolve arbitrability in a different form. It asked the trial court to kick, to grant a stay so that the substantive issues that American raised could be resolved in an arbitration. Its remedy was first to go to New York and ask for a stay. That's what its agreement calls for. And then second, to ask the trial court to stay the question so if it really believed this, the arbitration panel could decide what issues were arbitrable. It did neither of those things. It proceeded to ask the trial court to rule on arbitrability. That's a waiver. And it weighed any question of arbitrability at all by proceeding with the summary judgment ruling. Now, it's fascinating to me because a lot of what I just heard and a lot of what I read in the briefs has nothing to do with the reality of this case. Judge Fees understood that. They stood again today and made an argument that we have never made. We said below and we say here that the issue isn't whether we have some repayment obligation. We're not litigating a repayment obligation under the payment agreements. He keeps talking about the payment agreements and what Judge Fees did. What Judge Fees talked about was the policies. All we have ever said was if what American is saying is that a future right to collect a repayment somehow excuses a present duty to pay, that would render the policy illusory. We're not saying and have never said in the lawsuit that American may not someday have under a payment agreement some right to collect a repayment of money. Our claim was that future repayment right doesn't excuse a present duty today. And we analogize in the trial court something I think is completely accurate, which is the bank that makes a loan to buy a house. If I go to my bank to buy a house and I sign a loan document, my bank doesn't get to say when it comes time for me to pay for my house, sorry, we don't have to pay because you have to repay us over the course of the next 30 years. A repayment obligation in the future doesn't excuse a present duty to pay. I've never seen an insurance policy like this. Are these common in the industry? Well, the standard form is common in the industry. The deductible coverage endorsement, the notion of a deductible endorsement, very common in the industry. But this insurance company pays up front subject to an obligation to repay. I've never seen it quite like this. Well, that's not uncommon. There are retrospective premium endorsements often on policies. There are deductible provisions where the insurance company fronts the money and the insurance company gets repaid by the insurer. There are large risk rating plans. In fact, the irony about this is these folks know this stuff. They do this, and we know they do it because they lost the Alator lawsuit before the Sixth Circuit on something nearly identical to this except with a broader arbitration clause that applied not only to disputes arising out of the payment agreement but disputes relating to the payment agreement. Now, they lost that in 2005. They continued to amend this agreement through 2008. All of that's in the excerpts of record. When you look at the payment agreements, they would go back in and amend them, and one of the amendments they did was to address who gets to address arbitrability. So even though they lost essentially the same dispute under an identical set of circumstances with a repayment agreement and general liability policies issued over the years, they didn't come back to the vendee here and say, you know what, we need to amend one other little thing. Our payment agreement simply says that disputes arising under that agreement get arbitrated. Now, when you look at the whole of the documents, which they purport to want to look at, it's rather an interesting phenomenon. They have four insurance policies. Each insurance policy has an integration clause. The integration clause says if you want to modify any term of this insurance policy, quote, this policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy. There is no such thing here that does that with an arbitration clause. So they want to set aside the integration clause that specifies exactly how you change the terms of the policy, and they want you to ignore that. They have two different payment agreements that are modified over a series of years. Not once did they change the modification to stick the word policies into the arbitration clause, which is the longest clause in the agreement, and it's the only provision in the agreement that doesn't actually use the word policies. When you read the agreement itself, paragraph after paragraph, provision after provision, talks about insurance policies, but when you get to the dispute resolution clause that talks about arbitration, policies is nowhere to be seen. They know how to use it. They stuck it everywhere else in the agreement, but in the arbitration and dispute provision, the word policies is nowhere to be found. They were particular. They used the word capital agreement, which is a defined term only. They made that election. I did the math. In that standard agreement, their payment agreement, there are 30 times where the word policies shows up. Thirty times. Not one of those is in the dispute resolution clause where it talks about arbitration. Not once. These folks knew how to do it. They elected not to do it in their insurance policies. They elected not to do it in the payment agreements. They elected not to do it in six to seven years of amendments to those payment agreements, and they elected not to do it in all the endorsements to the policies. Now, they decide to come up with the clever phrase master agreement. It's nowhere in there. Nothing says it's master agreement. If you were to look at where it all starts, it starts with the insurance policies. They're the ones that are seeking to arbitrate. There's not an arbitration clause in these policies. There's nothing to arbitrate until there's a payment that's been made and accepted, and then if there's a dispute about it, we can go off and arbitrate. Now, we know they know this because when we talked about the time sequence, one of the things that's interesting here is Universal Music and UMG got sued in April of 2005. They notified America in May of 2005. We sued America because we had no payments in April of 2007, and America finally processed some money for payment in April 2008. So we're talking three years after notice, a year after we sued them that they finally started to process payment, but that's not all that happened in that time period. They conducted extensive discovery. They injected the premium to the payment agreement in issue in the summary judgment motion, not us. Fact number 100 that they submitted in their motion was about the payment agreements. This wasn't a surprise to them. They knew what they were going to argue. They thought they were going to win on summary judgment before the trial court, and so they asked the trial court to rule. They made the intentional election of remedies below, and for them to say we didn't waive anything, because even after they conceded they knew about the payment agreement, they knew about the arbitration clause, they still asked Judge Fies to decide the substantive issue, and their defense against that issue was the payment agreement, this notion that because we have to pay you, you have to pay us tomorrow, we don't have to pay you today. I think the other thing. What is UMG's prejudice by the delay? Well, it goes beyond prejudice, Your Honor. We have a right to proceed in a court. We have a right to a jury trial on the defense issue. But that's a prong of any waiver claim, isn't it? It is a prong of waiver. Showing prejudice? Well, we had to engage for, well, first of all, it's a potential prong, but you can do an intentional relinquishment. If there was some question as to whether they intentionally relinquished it, then we might be talking, then waiver starts to look more like a stop and we'll talk about our prejudice. But I think the record's absolutely clear here that this is intentional relinquishment. They took bite after bite at the apple before they decided that they really wanted to press that issue. As for prejudice, we engaged in a year's worth of discovery. There's nothing to suggest that that discovery is the kind of discovery that would have been permitted in an arbitration over whether we had some payment obligation and how much that payment obligation is. It's a discovery related to a bunch of other things. If we belonged in a different forum, we should have been there. But you can't go into the trial court, ask for substantive rulings, ask for the trial court to decide arbitrability, and then come to this court and say, please forget that we asked for substantive rulings and please forget that we asked the trial court to decide arbitrability. But the litigation was primarily focused on the merits issue, and how are you prejudiced by that? Because that's ultimately where you want to go, right? It is ultimately where we want to go. I do agree with you on that, Your Honor. The discovery that was conducted, for the most part, was discovery that relates to the merits of the breach of contract and the bad faith claim. Now, when we're talking, though, about that breach of contract and bad faith claim, which they say must be litigated, it gets into the whole question of the defense they raise. They're saying we didn't breach our contract because you have to repay us at some point. They're the ones that said up front, that is an issue for the court, not for arbitration. Sotomayor, that's not quite right. They don't say we didn't breach the contract because they say even if we did breach the contract, you'd get no damages. That's true. So damages point. But they have injected it into the breach and bad faith claim. They're not liable, they say, for breach or bad faith because we have no damages. That is part of the resolution. Obviously, it's an element to prove breach or bad faith. We have to show damages. So unless they're now coming back to say we're going to parse up your claim that we just said should have been litigated, we didn't really mean that claim should have been litigated. We meant some of that claim should have been litigated and some of it should have been arbitrated. But if that's what they meant, they knew it when they filed the summary judgment motion because they put that in play. We didn't put it in play. And so that's part of what we're talking about in waiver. Now, I think the other point that's interesting to me is when you work through the timing, we filed our lawsuit in 2007. We don't know precisely when. It's rather curious that they claim they demanded arbitration. We do know when the amended demand was submitted, and that was in May of 2008. Let's put it in context here. When they did that demand, they did it by national union on behalf of its affiliated companies. So they were sweeping in the entire group of insurance companies. But they didn't do the same thing against Vivendi. They didn't say Vivendi and companies on behalf of, or Vivendi and the other parties to the agreement. They were very specific. Their original demand named four and only four Vivendi entities. They then amended in May of 2008, and they dropped one of those Vivendi entities. So now they're down to three. They do a second amendment now to reference the national union, I'm sorry, the American Home Lawsuit that we're involved in, and they don't say in that second demand, and we demand you arbitrate these issues, and we demand you arbitrate arbitrability. So they've gone from bringing a demand on behalf of the entire AIG family of companies against four Vivendi companies, not including either of the universal companies. They've dropped it to three Vivendi companies, and they still don't say, and everybody else. And when they reference the lawsuit, they don't talk about arbitrability of any of the issues. They simply say, we're going to arbitrate over some payments that might someday be due and repayments that might someday be due. That's in 05. I'm sorry, but when you work through it, they've answered our complaint. In answering the complaint, they reference the large risk rating plan and the deductible endorsement. That's in June of 07. They cite those provisions in answering interrogatories in 07. They file their motion for summary judgment in May of 08. And we oppose it. And then they do their arbitration. Their second amended arbitration demand is after we oppose it. And they say in this brief here to this court that they demanded arbitration against UMG. That's false. The arbitration demand was sent to the three or four initially Vivendi entities that were specifically named. The only way UMG got it was when it was attached to the state papers. It wasn't as if they served UMG and said we're arbitrating with you. They know how to do these things. They know how to frame it. They were very meticulous about how they framed it in their policies, about how they framed it in the agreements, about how they framed their arbitration demand. For whatever reason, they elected not to arbitrate against Universal Music specifically, but they want this court to overread what they've asked for. I don't think there's a question. I think it's an intentional waiver, but I don't think it's arbitrable in the first instance. The payment agreements are not the controlling documents here. The integrated policy is control. Thank you. Thank you. We've got a couple of minutes or so left on the bubble. Judge Fletcher, the checks were sent on June 12th, 2008, ER 687 to 689. In context, the motion for summary judgment was on May 30th, 2008. The opposition was filed on June 23rd, 2008. So the checks were sent in between those two pleads. So you're setting up your argument. Yeah. Judge, a question was raised about on page ER 582 about this role of the New York courts. Yes. And if you look very carefully at that language, I think you can see that what was specified there and what that addendum means is where you have a failure to arbitrate or you have a motion to compel arbitration. For example, under Section 4 of the Federal Arbitration Act, that would be presented to a New York court. Here we have something that's not within the scope of this provision. We had a motion to stay the proceedings in the district court under Section 3 of the Arbitration Act. That falls outside the scope of this clause on page 582 of the ER plainly. It says any action or proceeding concerning arbitrability. Yes. It seems a little broader than what you're saying. When I read this, Your Honor, I took it to mean, as I said, and because I think we have to harmonize this with the provisions of the payment agreement themselves on ER 572, which, I'm sorry, yes, ER 571, which provide, and 570, which provide that any issue of arbitration, any dispute under the agreement must be submitted to arbitration. So I read it and that the arbitrators have exclusive jurisdiction to determine arbitrability. So that must be something different from arbitrability that's talked about in the subsequent provision. Now, on the question of discovery, discovery was over the non-arbitrable issues. And in the motion for summary judgment, it's not true that American Home asked for the judge fees to determine the question of arbitrability. In fact, on page 4 of the memorandum that American Home submitted, it stated if there is any dispute concerning the extent of this reimbursement obligation, that dispute is subject to arbitration under the terms of the payment agreements. Because it wasn't until UMG opposed the motion for summary judgment that it actually interposed a dispute over its reimbursement obligation. It wasn't until that point that the arbitration clause was triggered. Up until that point, its reimbursement obligation was undisputed. It did not say it didn't have it. Okay, thank you. Thank you, Your Honor. The Asian Society will stand for a minute.
judges: Tunheim, Kozinski, Fletcher W.